GREGORY A. ROUGEAU (194437)
BRUNETTI ROUGEAU LLP
235 Montgomery Street, Suite 830
San Francisco, CA  94104
Telephone: (415) 992-8940
Facsimile: (415) 992-8915
e-mail:  grougeau@brlawsf.com

Counsel for Defendant and Counterclaimant
DARIUS BANASIK, individually and
derivatively on behalf of QYRAL, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HANIEH SIGARI, an individual; QYRAL, LLC, a California Limited Liability Company,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>DARIUSZ BANASIK, an individual; Does 1-10,<br><br>　　　　Defendants.<br>_____<br>DARIUSZ BANASIK, individually and derivatively on behalf of QYRAL, LLC,<br><br>　　　　Counterclaimant,<br><br>　　v.<br><br>HANIEH SIGARI, an individual,<br><br>　　　　Counterdefendant. | Case No. 5:24-cv-01816-EJD<br><br>**COUNTERCLAIM OF DARIUS BANASIK, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF QYRAL, LLC, FOR:**<br><br>　1. **BREACH OF FIDUCIARY DUTY;**<br>　2. **DECLARATORY RELIEF;**<br>　3. **DISSOCIATION OF LLC MEMBERSHIP (Cal. Corp. Code § 17706.02)**<br>　4. **LLC ACCOUNTING;**<br>　5. **CONVERSION;**<br>　6. **UNJUST ENRICHMENT; and**<br>　7. **APPOINTMENT OF RECEIVER**<br><br>**JURY TRIAL DEMANDED** |

COUNTERCLAIM

DARIUS BANASIK (the "Counterclaimant"), individually and derivatively on behalf of QYRAL, LLC ("Qyral" or the "LLC"), hereby counterclaims and alleges against HANIEH SIGARI ("Sigari" or the "Counterdefendant") as follows:

## PARTIES

1.      Counterclaimant Dariusz Banasik is an individual residing in Palo Alto, Santa Clara County, California.

2.      Counterdefendant Hanieh Sigari is an individual also residing in Palo Alto, Santa Clara County, California.

3.      Counterclaimant and Counterdefendant Counterclaimant and Sigari were married on July 21, 2012, but presently are parties to a pending marital dissolution proceeding commenced by Counterclaimant in March 2024 in the Superior Court of California, County of Santa Clara.

4.      Qyral is a California limited liability company in good standing, and is a wellness company devoted to skin care and weight loss.  It is a member-managed limited liability company.

5.      Counterclaimant and Counterdefendant each own 50% of the membership interests in Qyral, and each manages the company. No signed LLC Operating Agreement exists for Qyral.

## SUBJECT MATTER JURISDICTION

6.      This Court has Supplemental Jurisdiction of the claims herein under 13 U.S.C. § 1367(a), as they relate to claims asserted by Counterdefendant in her First Amended Complaint (Docket No. 16) on file herein.

## PERSONAL JURISDICITION

7.      This Court has personal jurisdiction over all parties, who are residents of this State, reside in this District, and have sufficient minimum contacts with California, or have consented to personal jurisdiction by way of corporate registrations with the California Secretary of State.

## VENUE AND INTRADISTRICT ASSIGNMENT

8.      Venue is proper in this District, as a substantial amount of the underlying events occurred here, and there is pending litigation before the Court.

**DERIVATIVE NATURE OF CLAIMS**

9.      Counterclaimant brings these claims individually, but also derivatively for the benefit of Qyral, as a manager and member of Qyral and pursuant to California, to redress injuries suffered by Qyral as a direct result of Counterdefendant's wrongful conduct alleged herein. This action has been necessitated by Counterdefendant's persistent tortious conduct, which has not only caused the Qyral material harm, but continues to threaten its ongoing ability to operate. Counterclaimant will adequately and fairly represent Qyral's and its members' interests in enforcing and prosecuting its rights.

10.      Counterclaimant has not made any demand on Counterdefendant to agree to institute this action because such a demand would be futile. Counterdefendant, like Counterclaimant, is a member and manager of Qyral, but falsely asserts that she is Qyral's sole member and manager. Counterclaimant is informed and believes, and herein alleges, that Counterdefendant will not agree to the commencement of a lawsuit against herself, even if such suit is to the manifest interests of Qyral.

**FACTUAL ALLEGATIONS**

**I.      BACKGROUND**

11.      In or around mid-2018, Counterclaimant and Sigari determined to launch a business marketing and selling skincare products.  After researching various methods to "personalize" skincare, or make it unique to each customer, Counterclaimant and Sigari became familiar with MLM/Network-marketing (multi-level marketing), and Counterclaimant became convinced that it was the optimal way to market women's skincare products.  Counterclaimant and Sigari decided that upon formation of a company, Counterclaimant would handle business and operations, while Sigari would handle HR and sales; in effect, Sigari would be the "face" of the business, since women constitute not only the bulk of the consultants at MLM companies, but that the company's customer base was women's skincare.

2
COUNTERCLAIM

## II.    FORMATION OF QYRAL

12.    Counterclaimant and Sigari formed Qyral in 2019, with its focus on selling skincare products. Counterclaimant and Sigari are each 50% LLC members. Counterclaimant and Sigari never signed an Operating Agreement related to the management of the LLC.

13.    From its inception, Qyral struggled with the sale of skincare products. From 2019 through 2022, the sale of the company were as follows:

•2019:  $1,500

•2020:  $45,000

•2021:  $44,000

•2022:  $64,000

14.    Qyral evolved its product line to include prescription grade skincare products, to coincide with certain industry changes in telehealth due to COVID-19; this evolution required retention of a physician network and pharmacies to fulfill orders. While sales picked up slightly, the fortunes of the company remained challenged.

15.    As a consequence of the company's struggles, and on behalf of Qyral, Counterclaimant requested, and, over time, obtained $1,300,000 in financing from Banabrands LLC dba ecomblvd ("Bananrands'), a company owned by Counterclaimant's brother, Paul Banasik. An additional infusion of $50,000 in financing from other family members was also made to Qyral. By contrast, Sigari's father funded $40,000, and was repaid at the end of 2023.  Sigari has failed and refused to acknowledge in company financials the financing received from Banabrands or Counterclaimant's family, while her father was repaid in full in 2023.

16.    Notably, in return for financing Qyral, Banabrands entered into an IP Agreement with the vendor it used for its software to ensure that any IP created for Qyral would remain property of Banabrands.

17.    In late 2022, Sigari and Steve Lehman ("Lehman"), a technology investor, went on a business trip where they discovered pharmacies that were selling compounded semaglutide, a weekly injectable weight loss medication that was prescribed by doctors "off-label;" that is, not approved by the Food and Drug Administration. Counterclaimant convinced Sigari that in order to

become cash flow positive, Qyral needed the weight loss product line, as it was not a sustainable business, absent a launch of its weight loss medication.

18.    Counterclaimant then developed a "Weight List"- where customers that want the medication would pay $100 deposits, with a subsequent launch of Qyral's weight loss product in the event sufficient subscriptions were obtained- and Qyral realized significant growth in revenues. Between March and April, 2023, 397 people signed up and a total of $400,000 in revenue was realized.  At all times, Counterclaimant was intricately involved in Qyral's operations.

19.    From May 2023, once the weight loss concept appeared viable, Counterclaimant and Sigari worked together to build out the infrastructure to get the product to customers, and include it as part of the Qyral product offering. Sigari handled the physician network, sales team, and legal issues associated with medical products; Counterclaimant handled the pharmacy network, customer service, commission payments to consultants, and operations infrastructure. With that structure, Qyral scaled the customer service team to 15 people in six months.  Projected revenue for 2023 is forecasted to be 4,200,000, due in large part to Counterclaimant's work. Moreover, Counterclaimant structured a still pending Joint Venture agreement with an Arizona-based pharmacy that would "white label" its services, enabling Qyral to not only be a brand, but a pharmacy, further establishing Qyral's legitimacy in the marketplace, as this would be a first of its kind vertical integration. This agreement is also anticipated to cut our biggest cost, product costs, by 50%.

20.    Counterclaimant and Sigari own Qyral equally, and have always managed the company together since inception. As the "face" of the business, Sigari has used nominal titles as "President" or CEO," while Defendant has used various titles as well, including "CEO" and "Executive Chair." Both Qyral's tax returns, and the tax returns filed by Counterclaimant and Sigari, confirm that they are equal owners of Qyral.

## III.    QYARAL REMAINS FINANCIALLY DISTRESSED

21.    While Qyral enjoys substantial revenues and realized a cumulative gross profit of $1,583,547.11 for the period of January 2023 through February 2024, Qyral's cumulative net income over those 13 months is $-135,595.89.  Indeed, with the exception of July 2023, November 2023, and January 2024- three months- its net income was negative every month during the 13-

month period.  The current balance sheet indicates that Qyral has current assets retaining a value of $884,334.65, against total liabilities of $1,449,889.83.  By any definition, Qyral is financially distressed.

## IV.    SIGARI'S VARIOUS BREACHES

22.    Against the backdrop of Qyral's functional insolvency, Sigari unilaterally took actions that defrauded the company, breached her fiduciary duties as an LLC member and manager, and risked litigation exposure prior to the commencement of this case.  For example:

a.    Sigari has ostensibly retained at least one of her family members- her mother- who does not perform any employee activities for Qyral, as both an employee and an independent contractor.  Sigari's mother, Behnaz Alisalehi (who has been diagnosed with early onset dementia and is generally in poor health), has been paid $46,200 as an employee, even though her mother has never performed any activity associated with Qyral, has no active email with Qyral, nor has she had any interactions with any employees nor vendors. Further, I am informed and believe that Sigari's mother was also fraudulently registered as a Qyral Consultant, so she was paid additional thousands of dollars in that capacity, for absolutely nothing (further, being an employee and a consultant at the same time is otherwise prohibited by Qyral, as it is obviously a conflict of interest, since consultants are essentially vendors of the company);

b.    Sigari retained a fractional COO named Rob Brinkman for approximately five months, and paid Mr. Brinkman's company between $130,000 and $150,000. Mr. Brinkman's involvement with Qyral was minimal. Counterclaimant became informed that Sigari maintained a sexual relationship with Mr. Brinkman sometime during the time Mr. Brinkman was ostensibly involved with the company, and, when Counterclaimant confronted him regarding the relationship, he admitted as much, and attributed the relationship to Sigari's post-partum depression;

c.    Defendant is informed and believes that Sigari instructed one of her personal friends, Emily Atwell, who did not qualify for prescription grade injectable weight loss medication with Qyral, to add dumbbells to Ms. Atwell's pants to make Ms. Atwell appear heavier than she was, and to take a picture of herself on a scale, with the added weight, and send the fraudulent pictures to falsely demonstrate to physicians that she was overweight and needed to inject herself with Qyral's weight loss products. Sigari talked about this scheme to customer service staff at

5

Qyral, and posted a picture of Ms. Atwell, which Ms. Atwell apparently sent her, showing Ms. Atwell hiding the weights in her pants;

d.      Sigari diverted $150,000 from Qyral's corporate account into a personal Robinhood account, and then falsely claimed to Qyral's accounting team that the diverted funds were Qyral expenses and/or loan repayments, when they clearly were not;

e.      Sigari paid $70,000 toward a decorator for her personal residence, which is obviously not a Qyral business expense;

f.      In November 2023, Sigari had Qyral enter into a lease agreement to rent Sigari's personal residence, for $16,000 per month.  Sigari has asserted that the lease is a business expense, but it is obviously not a Qyral operating expense.  Further, all of Sigari's utilities and general expenses are run through Qyral;

g.      Sigari withdrew $10,000 in cash from Qyral for miscellaneous personal expenses.  When Counterclaimant confronted her regarding this withdrawal, she fraudulently described the withdrawal as a "Employee Holiday Pay," when all of Qyral's employees are remote to Palo Alto and thus not in a position to simply be handed cash;

h.      Sigari offered and issued, a 2% equity stake in Qyral to Lehman, whom she claimed was mentoring her, when Lehman did not contribute substantively to the company. Lehman has since surrendered that equity;

i.      Sigari concealed from Qyral's accountants the extent of Banabrands' financing of Qyral (in the amount of $1,300,000), such that it was only discovered through a forensic examination of Qyrals's records (thereby falsely portraying the true financial condition of the company);

j.      Counterclaimant is informed and believe that Sigari has misappropriated Qyral operating expenses to make luxury purchases, through Paypal, for Yves Saint Laurent and Luis Vuitton products;

k.      Sigari has failed to pay major company debts as they have come due. For example, while she was essentially looting the company for her personal benefit, Sigari failed and refused to pay Qyral's vendors.  One vendor, Hallandale Pharmacy- the primary pharmacy Qyral uses- was owed approximately $200,000 as late as March 22, 2024. The co-owner of Hallandale

6

unsuccessfully attempted, for weeks, to address this balance, Sigari simply ignored this most important pharmacy's inquiries. Worse, when Counterclaimant questioned one of Qyral's employees regarding this outstanding debt, the employee, Samira Fatehyar, confirmed by text that Sigari had instructed her not to disclose pharmacy issues with Counterclaimant;

l.　　Counterclaimant is informed and believes, and thereon alleges, that Sigari instructing the company's medical support team to not comply with Qyral's pharmacy's guidelines, including, but not limited to, instructing that product shipments be sent to customers in 3 month vials, when applicable CDC Guidelines state that "if a multi-dose has been opened or accessed (e.g., needle-punctured) the vial should be dated and discarded within 28 days unless the manufacturer specifies a different (shorter or longer) date for that opened vial."  Under Sigari's supervision, Qyral's  medical support team was instructed to skirt this rule;

m.　　Counterclaimant is informed and believes, and thereon alleges, that Sigari has endangered Qyral customers in order to continue to grow revenue by overseeing the prescription of prescribing medicine to individuals that did not qualify for it. Software developers were instructed by Sigari to not send Body Mass Index information for at least one customer to physicians, out of an apparent concern that because she was worried the customer would be disqualified from the medication;

n.　　 More recently, Sigari opened a new account for Qyral from which she ostensibly seeks to exercise sole control, for the purpose of continuing her looting of the company.

o.　　Further, Sigari has now locked Counterclaimant out of critical Qyral administrative databases and systems necessary for Counterclaimant to perform his duties with Qyral, to the detriment of the company including, but not limited to, payroll, email marketing accounts, consultant commission accounts, and Qyral's consultant Facebook group, which is an important channel for communicating with consultants. Moreover, Counterclaimant is informed and believe that she has directed consultants not to communicate with Counterclaimant, even though Counterclaimant's duties encompass almost exclusive communications with those consultants; and

p.　　Counterclaimant is informed and believes that Sigari is, or has, attempted or contemplated opening up a company in the same line of business as Qyral, and has downloaded Qyral's customer database for that purpose.

7

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

23. Counterclaimant hereby incorporates by this reference paragraphs 1 through 22, inclusive, as though fully set forth herein.

24. At all times material herein, Counterdefendant was a manager of Qyral, and, as such, is a fiduciary to Qyral and its members.

25. As a manager of Qyral, Counterdefendant owes, and has owed, Qyral and the other members the duties of loyalty and care.

26. The duty of loyalty requires Defendant: (1) to account to the LLC and hold as trustee for it any property, profit, or benefit derived by the member in the conduct and winding up of the activities of the LLC or derived from use of the LLC property, including the appropriation of an LLC opportunity; (2) to refrain from dealing with the LLC as or on behalf of a person having an adverse interest to the company; and (3) to refrain from competing with the LLC.

27. The duty of care requires Counterdefendant from engaging in (1) grossly negligent or reckless conduct; (2) intentional misconduct; and (3) any knowing violation of the law, in her activities with the LLC.

28. Counterdefendant has breached the fiduciary duties assumed by her as manager of Qyral as herein alleged.

29. As a proximate result of Counterdefendant's breach of fiduciary duty as herein alleged, the LLC and Counterclaimant have suffered damages in an amount the full nature and extent of which are presently unknown.

30. Defendant 's conduct as herein alleged was both oppressive and malicious in that it subjected the LLC and Counterclaimant to cruel and unjust hardship in willful and conscious disregard of the Company and Counterclaimant's rights, thereby entitling the LLC and Counterclaimant to an award of punitive damages.

WHEREFORE, Counterclaimant prays for Judgment against Counterdefendant as hereinafter set forth.

## SECOND CLAIM FOR RELIEF
### (Declaratory Relief)

31.    Counterclaimant hereby incorporates by this reference paragraphs 1 through 30, inclusive, as though fully set forth herein.

32.    An actual controversy has arisen between Counterclaimant and Counterdefendant as to their ownership and management of the LLC.

33.    By this Counterclaim, Counterclaimant seeks a judicial determination pursuant to Section 1060 of the California Code of Civil Procedure that he is a 50% LLC member in, and a manager of, Qyral.

WHEREFORE, Counterclaimant prays for Judgment against Counterdefendant as hereinafter set forth.

## THIRD CLAIM FOR RELIEF
### (Dissociation Of LLC Membership (Cal. Corp. Code § 17706.02))

34.    Counterclaimant hereby incorporates by this reference paragraphs 1 through 33, inclusive, as though fully set forth herein.

35.    Pursuant to Section 17706.02 of the California Corporations Code, a member may be expelled from a California limited liability company by judicial order when such member

"(1)    Engaged, or is engaging, in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the limited liability company's activities.

(2)    Willfully or persistently committed, or is willfully and persistently committing, a material breach of the operating agreement or the person's duties or obligations under Section 17704.09.

(3)    Engaged, or is engaging, in conduct relating to the limited liability company's activities that makes it not reasonably practicable to carry on the activities with the person as a member."

36.    By this Counterclaim, Counterclaimant seeks a judicial determination that Counterdefendant be expelled as a member of the LLC under Section 17706.02 of the California Corporations Code, in that she has engaged in wrongful conduct that has, and will, adversely affect

9

COUNTERCLAIM

the LLC's activities, she has breached her fiduciary duties as manager of the LLC, and her conduct relating to the LLC makes it not reasonably practicable to carry on the LLC's activities with Counterdefendant as a member, as herein alleged.

WHEREFORE, Counterclaimant prays for Judgment against Counterdefendant as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF
### (LLC Accounting)

37.     Counterclaimant hereby incorporates by this reference paragraphs 1 through 36, inclusive, as though fully set forth herein.

38.     During all times material to this Counterclaim, a relationship has existed between Counterclaimant, Counterdefendant, and Qyral.

39.     Counterclaimant is informed and believes, and thereon alleges, that damages have been suffered by Counterclaimant and Qyral as a consequence of Counterdefendant's conduct as herein alleged. The precise amount of such damages, and the LLC's true financial condition, can only be ascertained by an accounting.

WHEREFORE, Counterclaimant prays for Judgment against Counterdefendant as hereinafter set forth.

## FIFTH CLAIM FOR RELIEF
### (Conversion)

40.     Counterclaimant hereby incorporates by this reference paragraphs 1 through 39, inclusive, as though fully set forth herein.

41.      As alleged *supra*, in addition to looting Qyral of $150,000 from Qyral's corporate account, and then misrepresenting to Qyral's accounting team that the diverted funds were Qyral expenses and/or loan repayments, Sigari has wrongfully taken LLC operating funds to finance her personal extravagant lifestyle, including, but not limited to, rent payments for her personal residence, in the amount of $16,000 per month, expenses associated with her residence, and decorator expenses associated with her personal residence. She has also improperly withdrawn cash from Qyral, and made other extravagant purchases for personal uses using Qyral's account.

42. Sigari's receipt and retention of such payments constitutes a wrongful taking of the LLC's property, and has interfered with the LLC's ability to use that property. Counterdefendant's looting of the LLC funds constitutes conversion, and has caused the LLC damages, the full nature and extent of which are presently unknown.

43. Counterdefendant's conduct as herein alleged was both oppressive and malicious in that it subjected the LLC to cruel and unjust hardship in willful and conscious disregard of its rights and personal property, thereby entitling the LLC to an award of punitive damages.

WHEREFORE, Counterclaimant prays for Judgment against Counterdefendant as hereinafter set forth.

### SIXTH CLAIM FOR RELIEF
**(Unjust Enrichment)**

44. Counterclaimant hereby incorporates by this reference paragraphs 1 through 43, inclusive, as though fully set forth herein.

45. Plaintiff is informed and believes, and on that basis alleges, that Counterdefendant has been unjustly enriched at the expense of Qyral, as herein alleged.

46. As a proximate cause of Counterdefendant's conduct and unjust enrichment as herein alleged, the LLC has suffered damages, the full nature and extent of which are presently unknown.

47. Counterdefendant's conduct as herein alleged was both oppressive and malicious in that it subjected the Company to cruel and unjust hardship in willful and conscious disregard of the Company's rights and personal property, thereby entitling the Company to an award of punitive damages.

WHEREFORE, Counterclaimant prays for Judgment against Counterdefendant as hereinafter set forth.

### SEVENTH CLAIM FOR RELIEF
**(Appointment of Receiver)**

48. Counterclaimant hereby incorporates by this reference paragraphs 1 through 47, inclusive, as though fully set forth herein.

49. Due to the conduct of the Counterdefendant as herein alleged, there has existed, and

continues to exist, a virtual deadlock in the management of the LLC. Further, Counterdefendant's conduct as herein alleged literally threatens the LLC's ability to continue operations, to the detriment of the LLC, its members, and its creditors, and exposes the LLC to litigation.

50. Appointment of a receiver is necessary to oversee management of the affairs of the LLC, and, in particular, oversee Counterdefendant's activities on behalf of the LLC, until such time as the Court may fashion a more appropriate remedy in this action. The severity of the division between Counterclaimant and Counterdefendant, and Counterdefendant's wrongful conduct as herein alleged, is such that the orderly operation of the LLC's business will suffer irreparable injury, absent the appointment of a receiver.

WHEREFORE, Counterclaimant, individually and derivatively on behalf of Qyral, prays for judgment against Counterdefendant as stated below.

## PRAYER

1. For compensatory damages against Defendant, in an amount to be proven at trial, on Counterclaimant's First, Fifth and Sixth Claims For Relief;

2. For punitive damages against Defendant, in an amount to be proven at trial, on Counterclaimant's First, Fifth and Sixth Claims For Relief;

3. For a judicial declaration as to the parties' membership and management roles within Qyral, on Counterclaimant's Second Claim For Relief;

4. For a judicial determination that Counterdefendant be expelled as a member of the LLC under Section 17706.02 of the California Corporations Code, on Counterclaimant's Third Claim For Relief;

5. For appointment of a receiver, to oversee management of the affairs of Qyral until such time as the Court may fashion a more appropriate remedy, under Plaintiff's Seventh Claim For Relief;

6. For costs of suit incurred herein;

7. For attorneys' fees to the extent permitted by law; and

12

8.　　For such other and further relief as the Court may deem just and proper.

Dated:　April 20, 2024　　　　　　　　　　　BRUNETTI ROUGEAU LLP


By:　　*/s/ Gregory A. Rougeau*　　　　　　
　　　　Gregory A. Rougeau
　　　　Attorneys for Counterclaimant
　　　　DARIUS BANASIK

COUNTERCLAIM